UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- X
                        :

ALBERT WILLIAMS,           :

                        :

               Plaintiff,    :

                        :      **OPINION AND ORDER**

     - against -      :

                        :      **10 Civ. 8987 (SAS)**

REGUS MANAGEMENT GROUP, LLC, :

                        :

          Defendant.   :

------------------------------------------------- X

SHIRA A. SCHEINDLIN, U.S.D.J.:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/6/11

## I.    INTRODUCTION

       Albert Williams brings this action against Regus Management Group, LLC ("Regus" or the "Company"), alleging race discrimination and retaliation under the New York City Human Rights Law[1] ("NYCHRL"). Williams is a citizen of New York.[2] Regus is a Delaware corporation, with its headquarters and principal place of business located in Texas.[3] Williams originally filed suit in New York Supreme Court. Regus removed the matter to this Court under section

---

[1]    N.Y.C. Admin. Code § 8-107(1)(a).

[2]    *See* Declaration of Sharon Edmondson in Support of Notice of Removal ¶ 9 ("Edmondson Removal Decl.").

[3]    *See id.* ¶ 10.

1441(b) of title 28 of the United States Code.[4]  This Court has jurisdiction pursuant to section 1332(a) of title 28 of the United States Code.

Williams claims that he was discriminated against at Regus and that when he complained about the discrimination, he was ordered to relocate from New York City to Dallas.  When he refused to relocate, he was fired.  Regus moves for summary judgment on both of Williams' claims.  Regus argues that as part of business changes and cost-cutting measures, it had long planned to either transfer Williams to Dallas or fire him.  Regus further argues that there is no evidence to support an inference that Regus discriminated against Williams on the basis of his race or that it subsequently retaliated against him for reporting his concerns about racial discrimination at the Company.

According to Regus, a "reasonable implication [of the facts] is that Plaintiff realized his job was at risk and complained of racial discrimination to pressure Regus to keep him by raising the specter of litigation."[5]  According to Williams, Regus only decided to order him to relocate after he complained of discrimination, similarly situated Caucasian employees were not ordered to

_____

[4]    *See* Notice of Removal of Civil Action to United States District Court [Docket No. 1].

[5]    Regus Management Group LLC's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment ("Def. Mem.") at 2.

relocate, and the management's reaction to his claims of discrimination shows that Regus' business justifications were actually pretext for retaliation and discrimination.  Deciding between these two reasonable interpretations of the facts requires weighing conflicting pieces of evidence and making numerous credibility determinations – judgments that must be left to a jury.  For these reasons, Regus' motion for summary judgment is denied.

## II.    BACKGROUND[6]

### A.    Williams' Career with Regus

Williams, who is African-American, has worked in information technology ("IT") for over twelve years.[7]  Regus "provides furnished, equipped and staffed office space to businesses in over 1100 business centers located in excess of 450 cities in 75 countries."[8]

Regus hired Williams in October 2005 as its Director of IT

---

[6]    The following facts are drawn from the Complaint and from the parties' Rule 56.1 statements and supporting documentation.  The facts are undisputed unless otherwise noted; where disputed, they are construed in the light most favorable to the plaintiff.  *See, e.g.*, *Federal Ins. Co. v. American Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

[7]    *See* Videotaped Examination Before Trial of Albert Williams ("Williams Dep.") 134:21-23.

[8]    Declaration of Christian David Hadfield in Support of Defendant Regus Management Group, LLC's Motion for Summary Judgment ("Hadfield Decl.") ¶ 3.

Operations.[9]  In this role, he managed "day-to-day operations of the IT department and . . . the support of over 400 business centers in North America."[10]  Williams' responsibilities "evolved over time but the crux of his position dealt with putting out IT fires for Regus's clients and overseeing his technical team."[11]  He was considered to be "great at firefighting"[12] and Regus rewarded him with a bonus in February 2010.[13]

When he began working for Regus, Williams was based in Dallas, where the bulk of Regus's administrative and executive functions are performed,[14] and where its IT team is based.[15]  Williams moved to New York in May 2007 for

---

[9]    *See* Regus Management Group LLC's Rule 56.1 Statement in Support of Its Motion for Summary Judgment ("Def. 56.1") ¶ 1.

[10]    Williams' Counterstatement of Material Facts ("Pl. 56.1") ¶ 22.

[11]    Def. Mem. at 3.

[12]    Deposition of Sharon Edmondson, Regus' Vice-President of Global Human Resources, ("Edmondson Dep.") 121:21.

[13]    *See* Pl. 56.1 ¶ 25.  The bonus was a "spot bonus given to [Williams] as one of the hand-selected individuals in recognition for his efforts during 2009." Edmondson Dep. 83:11-13.

[14]    *See* Edmondson Removal Decl. ¶ 3.

[15]    *See* Deposition of Christian David Hadfield ("Hadfield Dep.") 101:3-5.

personal reasons, but continued to work for Regus in the same capacity.[16]

According to Williams, Guillermo Rotman, Regus' CEO for the Americas,

personally permitted Williams to work from New York and told Williams that "I

don't care where you work, as long as you don't leave the company."[17]  At the time

of the move, Regus advised Williams that the "relocation would be monitored

closely to determine if it was working."[18]  There is testimony that as early as 2008,

Williams' supervisors may have discussed asking him to return to Texas.[19]

However, these discussions did not lead to concrete plans for his return.  Indeed,

on June 10, 2010, Edmondson told Williams that "everyone agrees that for the

most part you have made [the long-distance arrangement] work quite effectively

over the past year or so."[20]  Rotman testified that he did not recall anybody ever

telling him of any problems that arose because Williams was working from New

---

[16]    *See* Williams Dep. 73:4-78:23.

[17]    Affidavit of Albert Williams ("Williams Aff.") ¶ 5.  Rotman disputes
that he made this statement, but agrees that he permitted Williams to work from
New York as long as the arrangement worked for the company. *See* Deposition of
Guillermo Rotman ("Rotman Dep.") 46:10-20.

[18]    Edmondson Decl. ¶¶ 4, 19.  *See also* 2008 Performance Review, Ex. 9
to Edmondson Decl.

[19]    *See* Edmondson Dep. 196:21-24.

[20]    6/10/10 Email from Edmondson to Williams, Ex. M to Williams Aff.

York.[21]

During his first four years as Director of IT Operations, Williams reported to Jason Schwendinger, a Caucasian with whom Williams says he "had a positive working relationship."[22]  Regus terminated Schwendinger and ten other IT employees in early 2009 as part of a small wave of layoffs.[23]  After that, Williams reported to Schwendinger's former supervisor, Christian Hadfield, who is also Caucasian.[24]  Hadfield, who has worked for Regus since 2004, is responsible for overseeing all of IT and procurement, and works out of the Company's Florida office.[25]

## B.    Regus' Shifting Business Structure and the Geographic Distribution of Its Management

As a technology and office services company, Regus "is often required to restructure its departments in order to adapt to . . . technology changes, and to save costs," and the IT Department was one of these departments.[26]  In

---

[21]    *See* Rotman Dep. 47:2-5.

[22]    Complaint ("Compl.") ¶ 6.

[23]    *See* Hadfield Decl. ¶ 19.

[24]    *See* Compl. ¶ 5.

[25]    *See* Rotman Dep. 169:16-22.

[26]    Def. 56.1 ¶ 14.

2008, Hadfield, Edmondson, and Rotman began planning to reorganize and pare down the IT Department in response to the economic crisis.[27]  As of December 2008, part of Hadfield's reorganization plan was to terminate Williams and hire someone in Dallas at a lower salary.[28]  A January 2009 email from Hadfield indicated that recruitment for Williams' replacement had already begun and proposed that Williams be replaced by May 2009.[29]  That date shifted by a year, according to Regus, because Hadfield decided that Williams should stay until the completion of a large IT project in May or June of 2010.[30]  In December 2009, Hadfield produced a new restructuring plan that proposed terminating Williams and merging his IT Director role with the Telecoms Director role, and giving both responsibilities to Trish Welker, a white employee who at the time was Telecoms Director.[31]  Under the proposal, the new combined IT and telecoms helpdesk would

---

[27]      *See* Declaraton of Christian Hadfield in Support of Defendant Regus Management Group, LLC's Reply to Opposition to Motion for Summary Judgment ("Hadfield Reply Decl."). ¶ 2.

[28]      *See* Hadfield Decl. ¶ 28; Americas Update (Hadfield), PowerPoint Presentation at 3 (attachment to 12/13/08 Email from Hadfield to Kamal Barakat (8:52 AM)), Ex. 10 to Hadfield Decl.

[29]      *See* 1/30/09 Email from Hadfield to Rotman, Jeff McCall, Barakat, and Edmondson (11:16 AM), Ex. 11 to Hadfield Decl.

[30]      *See* 12/15/09 Email from Hadfield to Rotman, McCall, and Edmondson (9:38 PM), Ex. 13 to Hadfield Decl.

[31]      *See id.*

be "100% dallas based" (sic).[32]  Apart from the cost savings and location change,

Hadfield indicated no other reasons for his decision to terminate Williams.  Regus

has not submitted any evidence showing that Hadfield's proposal was approved or

finalized. Indeed, Edmondson says only that Regus "had *discussed* including

Plaintiff in prior rounds of layoffs and restructuring his position of Director of IT

Ops into a Dallas-based IT Helpdesk Manager position" (emphasis added), but not

that such a decision had been made.[33]  In fact, Welker did not take over all of

Williams' responsibilities; instead, a new (white) recruit was hired in Dallas at a

lower salary with the title of manager, rather than director.[34]

Regus provides temporary and virtual offices to businesses

worldwide, giving its customers the ability to work from remote locations.  Remote

and virtual work also appears to be relatively common among Regus' managers.

For example, Brent Roberts, the Director of IT Sales, lives and works in California,

while his team is based in Dallas;[35] Carla Clements, manager of videoconferencing,

---

[32]     *Id*.

[33]     Edmondson Decl. ¶ 10.  *See* Edmondson Dep. 194:3-6.

[34]     *See* Hadfield Dep. 208:22-23; Regus Management Group LLC's
Memorandum of Points and Authorities in Support of Its Reply to Opposition to
Motion for Summary Judgment at 4.

[35]     *See* Pl. 56.1 ¶ 79.

lives and works in Atlanta;[36] Michael Beretta, VP of Business Development, lives outside of Dallas but manages people located in Dallas;[37] and Robert Gaudreau, the Executive VP of Sales, works out of Connecticut.[38]  Rotman works out of Florida[39] even though "the administrative and executive functions of Regus are performed in Texas" and "the day-to-day control of the company is exercised in Texas."[40]

Rotman testified that "it was decided as a company that we need to have our executives on the IT department, ok, and our telecom executives in Dallas."[41]  But Hadfield, who was the head of IT and procurement, was never required to move to Dallas from Florida, even though his team was in Dallas.[42] Similarly, Stan Liss, who was Director of IT Projects, worked from Atlanta, and although there were discussions of moving him to Dallas, he was never required to do so.[43]

---

[36]     *See id.* ¶ 81

[37]     *See id.*  ¶ 78.

[38]     *See id.* ¶ 77.

[39]     *See id.* ¶ 38.

[40]     Edmondson Removal Decl. ¶ 3.

[41]     Rotman Dep. 169:5-7.

[42]     *See id.* 169:18-22; 170:23-24.

[43]     *See id*. 172: 9-19; Pl. 56.1 ¶ 76.

C.     The Alleged Discrimination

Williams bases his primary claim of discrimination on his relationship

with Hadfield.  Williams states that after he began reporting to Hadfield, "Hadfield

made it clear that he had no interest in working with [Williams] because [Williams

is] African-American."[44]  Williams believes that his race made Hadfield view him

"differently than [his] Caucasian counterparts."[45]  Furthermore, Williams states

that "Hadfield would ignore [Williams] and fail to appear for bi-weekly calls that

were scheduled."[46]  Williams also says that his "opinions on technical matters were

completely dismissed," despite his experience with Regus.[47]  When Williams tried

to communicate his concerns, Hadfield "ignored [him] even when [Williams] told

him that [he] felt ignored."[48]  Furthermore, Williams "observed that Hadfield

would speak with the Caucasian employees, including employees who had lower

titles than [Williams]," even as he ignored Williams.[49]  Regus, on the other hand,

maintains that Hadfield communicated as much with Williams as Hadfield's busy

---

[44]     Williams Aff. ¶ 7.

[45]     *Id.*

[46]     *Id.* ¶ 8.

[47]     *Id.* ¶ 9

[48]     *Id.*

[49]     *Id.* ¶ 8.

schedule allowed: By Hadfield's own calculation, he sent Williams hundreds of

emails.[50]  To the extent that Hadfield cancelled scheduled calls with Williams, he

did so with other employees as well.[51]

Williams also claims that Hadfield excluded him from decisions about

matters critical to his job.  First, Hadfield terminated the position of one of

Williams' subordinates in January 2010.[52]  Hadfield did not consult with Williams

before making this decision, notwithstanding that Williams had the most direct

knowledge about the employee's work.[53]  Around that time, Regus management

also determined that its United Kingdom vendors could not support Regus' new

firewall and that the relevant functions should be moved to Regus' office in the

Philippines.[54]  This change meant that the Regus Help Desk — with which

Williams worked on a daily basis — would be located in Asia rather than in

Europe.  Although coordination with the Help Desk was a major part of Williams'

---

[50]     *See* 3/15/10 Email from Hadfield to Edmondson (4:04 PM), Ex. 3 to Edmondson Decl.

[51]     *See* Hadfield Decl. ¶ 12.

[52]     *See* Williams Aff. ¶ 11.

[53]     *See id.*; *see also* Pl. 56.1 ¶ 40, Hadfield Dep. 120:19-121:18.  Hadfield acknowledges that he made the decision without consulting Williams, but claims that Williams expressed no serious concern when Hadfield told him.  Williams' response was "I understand."  Hadfield Dep. 123:4-5.

[54]     *See* Def. Mem. at 5.

job,[55] he did not learn of the location change until well after the decision was

made.[56]  By contrast, Liss, who also reported to Hadfield, learned of the change

much sooner, even though he spent less time working with the Help Desk.[57]

Hadfiled testified that Liss was "responsible for providing technical info and

planning the migration from the Centrinet firewall to the Clavister firewall," but

also acknowledged that Williams had "the responsibility for managing [the

Clavister] center."[58]  Rotman testified that he was surprised that Williams had not

been aware that the Help Desk was being moved.[59]

In January 2010, Regus terminated fifty-seven employees.[60]

Williams' perception of the impact of these layoffs on the Company's African-

---

[55]       *See* Pl. 56.1 ¶ 59.

[56]       *See id.* ¶ 61.

[57]       *See id.* ¶¶ 58-61.  Regus asserts that it "had no reason to include"
Williams in deciding to move the Help Desk to Manila, whereas Liss, as Director
of IT Projects, needed to be involved in the decision because he would be
coordinating the Help Desk move.  Def. Mem. at 15.  The parties dispute whether
Liss' title, Director of IT Projects, was inferior to Williams' title, Director of IT
Operations.  Edmondson testified that although Williams' title was superior to
Liss' title, in February 2010 they were essentially "peers" at Regus.  Edmondson
Dep. 39:12-19.

[58]       Hadfield Dep. 173:11-24.

[59]       Rotman Dep. 144:12-23.

[60]       *See* Regus Management Group LLC's Rule 56.1 Reply Statement in
Further Support of Its Motion for Summary Judgment ("Def. Reply 56.1")  ¶ 46.

American workforce serves as a second basis for his charge of discrimination.

Williams was concerned about the layoffs "especially in light of how few African-

Americans in management positions there are at Regus."[61]  He states that in the

January layoffs, "Regus terminated 17 employees in its Corporate division . . . .

[and] [o]f the 17, eight were African-Americans, a number that was vastly

disproportionate to the number of African-Americans in that Division."[62]

Regus disputes these numbers, saying that only five out of twenty-six

Corporate division employees who were laid off were African American and that

twelve of the fifty-seven total employees laid off were African-American,[63] figures

that compare more closely to its workforce population, which is eighteen percent

African-American.[64]

### D.   Williams' Complaints of Discrimination and Regus' Response

Upset by what he saw as the disproportionate impact on Regus'

African-American employees, Williams emailed Rotman on February 25, 2010,

---

[61]      Williams Aff. ¶ 13.  Williams cites deposition testimony by Rotman and Edmondson that reveals that, at that time, Regus had only three senior executives who were African-Americans.

[62]      *Id.* ¶ 12.

[63]      *See* Def. 56.1 ¶¶ 7, 45.

[64]      *See id.* ¶ 8.

"expressing [his] concerns about the discriminatory nature of the . . . layoffs."[65]

Rotman forwarded Williams' email to Edmondson, Regus' Vice-President of

Global Human Resources, asserting that the allegations were "nonsense" and

asking her to help him respond.[66]   Rotman wrote Williams the following morning,

saying that the numbers Williams cited "are not accurate and [his] accusation could

not be further from the truth."[67]   Rotman also told Williams that "the results of our

reductions . . . were carefully reviewed by management across multiple ethnic

groups" and that "race is never a determining factor" in layoffs.[68]   However,

Rotman testified that all of the members of management besides himself who

reviewed the layoffs were Caucasian.[69]   Rotman, who is from Argentina, describes

---

[65]     Williams Aff. ¶¶ 13-15; Def. 56.1 ¶ 6.  Williams testified that he did not address his complaint to the Human Resources Department first because Rotman had informed him that if Williams had any problem, he should come directly to him.  *See* Williams Dep. 118:18-24.

[66]     2/26/10 Email from Rotman to Edmondson (5:26 AM), Ex. 1 to Declaration of Guillermo Rotman in Support of Defendant Regus Management Group, LLC's Reply to Opposition to Motion for Summary Judgment ("Rotman Decl.").

[67]     2/26/10 Email from Rotman to Williams (11:18 AM), Ex. 1 to Rotman Decl.

[68]     *Id.*

[69]     *See* Rotman Dep. 29:5-13.

himself both as "Latin" and as white.[70]  Rotman acknowledges that he did not

personally review Williams' figures regarding the racial distribution of layoffs, but

was told by Edmondson that they were incorrect.[71]

      Later that day,  Rotman called Williams and, according to Williams,

"started to shout at [him]" and made him "[feel] very threatened . . . , as Rotman

was simply yelling and screaming and saying [the discrimination] never happened .

. . ."[72]  Williams testified that "[n]ot at one time did [Rotman] say, Hey, Albert,

give me an example of what happened.  Immediately: This never happened.  This

is impossible.  Not at one time did he say, Hey, Albert, tell me what's

happening."[73]  As a result of the conversation, Williams retained counsel.[74]

Williams testified that after he complained and retained counsel, Hadfield started

to "express[] 'concerns' about [Williams'] performance"[75] and  "found it necessary

to belittle and scream [and] yell" at Williams on multiple telephone calls, even

---

[70]    *Id.*

[71]    *See id.* 97:2-14.

[72]    Williams Aff. ¶ 18.  Regus disputes the substance and tenor of the call.  *See* Def. Reply 56.1 ¶ 52.

[73]    Williams Dep. 147:15-19.

[74]    *See* Williams Aff. ¶ 18.

[75]    Williams Aff. ¶ 20.

when they were just talking about technical matters.[76]

The week after his first complaint, Williams and Edmondson talked by videoconference and Williams explained his perception that Regus was discriminating against African-Americans.[77]  In a follow-up email, Williams emphasized that he felt personally discriminated against and was not solely concerned about the racially disproportionate effect he saw in the layoffs.[78]  In particular, he told Edmondson that he believed Hadfield was excluding him "from projects and decisions" and that Hadfield was generally ignoring Williams' attempts to communicate with him.[79]

On May 7, 2010, Williams again emailed Rotman, saying that nothing had changed and that he felt Regus was retaliating against him for his previous complaints by continuing to make management decisions without consulting him.[80]  Williams asked Rotman to "[p]lease help" and expressed his belief that his job was "being siphoned away from [him] and significant portions turned over to

---

[76]     Williams Dep. 148:2-24.

[77]     *See* Williams Aff. ¶ 19.

[78]     *See* 3/8/10 Email from Williams to Edmondson (2:43 PM), Ex. G to Williams Aff.

[79]     Def. 56.1 ¶ 10.

[80]     *See* 5/7/10 Email from Williams to Rotman (4:34 PM), Ex. I to Williams Aff.

Caucasian employees."[81]   As before, Rotman forwarded the email to Edmondson,

commenting that "[t]his is nonsense.  No one is discriminating against Albert.  He

is very wrong."[82]   The next day, Edmondson emailed Williams to tell him that he

should schedule a trip to Dallas in order to meet with her and Hadfield "to discuss

[Williams'] concerns, the changes that have occurred and are continuing to occur

within the IT structure in Regus and [Williams'] role in the organization moving

forward."[83]

### E.      The Dallas Transfer Order and Williams' Termination

Williams met with Edmondson and Hadfield in Dallas on May 20,

2010.[84]   At this meeting, Edmondson and Hadfield notified Williams that he would

have to relocate to Dallas.[85]   From what they told him, Williams believed that

Regus was having him relocate because the "racial discrimination problems [were]

being] summed up as communication issues" and the solution the Company saw

for such issues was for Williams to return to Dallas to be with some of the rest of

---

[81]      *Id.  See also* Williams Aff. ¶¶ 23-24.

[82]      5/10/10 Email from Rotman to Edmondson (7:00 AM), Ex. J to
Williams Aff.

[83]      5/11/10 Email from Edmondson to Williams (4:23 PM), Ex. K to
Williams Aff.

[84]      *See* Def. 56.1 ¶ 11.

[85]      *See id.*

the IT Department.[86]  Additionally, though Edmondson "told [Williams] that the

decision to ask [him] to move back to Dallas was made back in January," Williams

noted that only after he complained of discrimination did Regus determine that his

transfer was a pressing need.[87]  The next week, Williams emailed Rotman again,

noting that his transfer to New York had worked well for the Company and

asserting that "this is not a business decision, but rather an effort to get rid of

me."[88]  Williams asked that Regus reconsider the decision to relocate him to

Dallas.[89]

On June 17, 2010, Edmondson emailed Williams to determine

whether he would consider moving to Dallas.[90]  In his reply, Williams stated that a

Dallas relocation was an "option [he could not] reasonably accept," due to his

---

[86]     Williams Dep. 229:8-11.  Edmondson testified that her aim in talking with Williams about the communication issues was to clarify why she was notifying Williams of the transfer: though Regus had already decided that he should go to Dallas, she did not want it to seem that there was "a secret, so to speak, that was not on the table and visible in the bigger picture."  Edmondson Dep. 190:18-20.

[87]     *See* 5/28/10 Email from Williams to Rotman (11:49 PM), Ex. L to Williams Aff. (complaining that he was not informed until May 20 of the decision to transfer him to Dallas).

[88]     *Id.*

[89]     *See id.*

[90]     *See* 6/17/10 Email from Edmondson to Williams (11:49 PM), Ex. 4 to Edmondson Decl.

-18-

wife's medical condition, which required her to remain near her doctors in New York.[91]  Edmondson then suggested that Williams request leave under the Family Medical Leave Act because his wife needed care.[92]  Edmondson also reiterated that "staying in [his] current position based in New York on an open ended basis is not an option" and that "[a]t this juncture the only option is moving back to Dallas" soon or else Regus would need to "explore an exit strategy from the [C]ompany."[93]

In August 2010, the attorneys for Williams and Regus met to discuss settlement possibilities, but these discussions failed.[94]  Finally, on August 30, 2010, Edmondson and Williams met in New York, where she informed him about four non-IT positions for which he could apply.[95]  Regus asserts that despite being outside Williams' area of expertise, one of these positions had "the potential of

---

[91]     6/21/10 Email from Williams to Edmondson (2:00 PM), Ex. 5 to Edmondson Decl.

[92]     See 6/29/10 Email of Edmondson to Williams (6:03 PM), Ex. 6 to Edmondson Decl.

[93]     Id.

[94]     See Pl. 56.1 ¶¶ 84-85.

[95]     See Edmondson Decl. ¶ 17; Williams Aff. ¶ 35. See also Current Openings in the NY Market (As of 8/29/10), Ex. 8 to Edmondson Decl. (listing positions shown to Williams).  The positions were "not offered" to Williams, but were merely available, so it is not certain that he would have been hired for them had he chosen to apply, especially since they were outside his area of expertise. Edmondson Dep. 280:3-15.

earning more money than [Williams'] current position."[96]  Williams does not

address this assertion, but explains that because the positions were "junior" and

were outside of IT, they "would have constituted a setback in [his] career."[97]

Williams declined either to apply for the positions or move back to Dallas.

Edmondson testified that she then offered Williams a severance agreement but that,

instead of signing it, Williams "started packing his desk up."[98]  Subsequently,

Regus interviewed four candidates to replace Williams in Dallas; neither the

person who was eventually hired, nor any of those interviewed, were African-

American.[99]

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."[100]  "'An issue of fact is genuine if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  A fact is material

---

[96]     Defendant's Reply to Plaintiff's Response to 56.1 Statement of
Material Facts ("Def. 56.1 Reply") ¶ 89; Def. Resp. Mem. at 9.

[97]     Williams Aff. ¶ 35.

[98]     Edmondson Dep. 279:23.

[99]     *See* Hadfield Dep. 209:14-17.

[100]    Fed. R. Civ. P. 56(a).

if it might affect the outcome of the suit  under the governing law.'"[101]

In a summary judgment setting, "[t]he moving party bears the burden of establishing the absence of any genuine issue of material fact."[102]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[103]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[104] and cannot "'rely on conclusory allegations or unsubstantiated speculation.'"[105]

In deciding a motion for summary judgment, a court must "'construe the facts in the light most favorable to the non-moving party and must resolve all

---

[101]    *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

[102]    *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

[103]    *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[104]    *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

[105]    *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

ambiguities and draw all reasonable inferences against the movant.'"[106]  However,

"'[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge.'"[107]

"'The role of the court is not to resolve disputed issues of fact but to assess

whether there are any factual issues to be tried.'"[108]

Summary judgment may be proper even in workplace discrimination

cases, which tend to be very fact-intensive, because "'the salutary purposes of

summary judgment — avoiding protracted, expensive and harassing trials — apply

no less to discrimination cases than to other areas of litigation.'"[109]  However,

"'[b]ecause direct evidence of an employer's discriminatory intent will rarely be

found,' motions for summary judgment in employment discrimination actions

---

[106]    *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir. 2011) (quoting
*Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

[107]    *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)
(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000))
(emphasis removed).

[108]    *Brod*, 653 F.3d at 164 (quoting *Wilson v. Northwest. Mut. Ins. Co.*,
625 F.3d 54, 60 (2d Cir. 2010)).

[109]    *Lu v. Chase Inv. Serv. Corp.*, 412 Fed. App'x 413, 415 (2d Cir. 2011)
(quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)).  *Accord
Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

should be evaluated with caution."[110]  Nonetheless, a plaintiff bringing a workplace discrimination claim must make more than conclusory allegations in order to defeat a motion for summary judgment.[111]  It is incumbent upon courts to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."[112] And although "claims under the NYCHRL are 'more liberally construed than claims under Title VII and the [New York State Human Rights Law], the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56.'"[113]

## IV.   NEW YORK CITY HUMAN RIGHTS LAW

---

[110]   *Gear v. Department of Educ.*, No. 07 Civ. 11102, 2011 WL 1362093, at *2 (S.D.N.Y. Mar. 30, 2011) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

[111]   *See id.*

[112]   *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).  *Accord Cameron v. Community Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) ("'[P]urely conclusory allegations of discrimination, absent any concrete particulars,' are insufficient" to satisfy an employee's burden on a motion for summary judgment) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (alteration in original)).

[113]   *Ballard v. Children's Aid Soc'y*, 781 F. Supp. 2d 198 (S.D.N.Y. 2011) (quoting *Deshpande v. Medisys Health Network, Inc.*, No. 07 Civ. 375, 2010 WL 1539745, at *22 (E.D.N.Y. Apr. 16, 2010) (quotation marks omitted)).  *Accord Julius v. Department of Human Res. Admin.*, No. 08 Civ. 3091, 2010 WL 1253163, at *5 (S.D.N.Y. Mar. 24, 2010).

Williams brings his discrimination and retaliation claims solely under

the NYCHRL, which provides, in relevant part, that

> [i]t shall be an unlawful discriminatory practice . . . [f]or an
> employer or an employee or agent thereof, because of the
> actual or perceived age, race, creed, color, national origin,
> gender, disability, marital status, partnership status, sexual
> orientation or alienage or citizenship status of any person, to
> refuse to hire or employ or to bar or to discharge from
> employment such person or to discriminate against such
> person in compensation or in terms, conditions or privileges
> of employment.[114]

Courts previously interpreted the NYCHRL as being coextensive with Title VII

and the New York State Human Rights Law.  But by enacting the Local Civil

Rights Restoration Act of 2005 ("Restoration Act"),[115] "the New York City

Council . . . rejected such equivalence."[116]  The City Council's passage of the

Restoration Act "confirm[ed] the legislative intent to abolish 'parallelism' between

the [NYCHRL] and federal and state anti-discrimination law."[117]  The NYCHRL

must be construed "independently from and 'more liberally than' [its] federal and

---

[114]   N.Y.C. Admin. Code § 8-107(1)(a).

[115]   N.Y.C. Local Law No. 85 (2005).

[116]   *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir.
2009).  *Accord Buckman v. Calyon Sec. (USA) Inc.*, No. 09 Civ. 6566, 2011 WL
4153429, at *7 (S.D.N.Y. Sept. 13, 2011).

[117]   *Loeffler*, 582 F.3d at 278 (quoting *Williams v. New York City Hous.
Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)).

state counterparts."[118]   As a result, although interpretations of similar laws may be used, they act only as "a floor below which the City's Human Rights law cannot fall."[119]

Under the Restoration Act, the NYCHRL "explicitly requires an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language."[120]   However, for both discrimination and retaliation claims under the NYCHRL, courts continue to apply the three-step, burden-shifting framework that the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*.[121]   The difference is that within that framework, courts must address the NYCHRL's "uniquely broad and remedial purposes, which go beyond those of counterpoint State or federal civil rights laws."[122]   This means that, at least in the retaliation context, "no 'type of challenged conduct [may] be categorically rejected as nonactionable' under the

---

[118]     *Id.*

[119]     *Id.*

[120]     *Williams*, 872 N.Y.S.2d at 31.

[121]     411 U.S. 792, 802-03 (1973).

[122]     *Williams*, 872 N.Y.S.2d at 31.

[NYCHRL]."[123]  However, a plaintiff "must demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees' due to unlawful discrimination."[124]

## A.   Discrimination

An employee initially bears the burden of producing evidence sufficient to support a prima facie case of discrimination.[125]  However, such evidence need be no more than "minimal" or "de minimis."[126]  In the Title VII context, the prima facie case consists of a showing that the employee: (1) belongs to a protected class, (2) was qualified for the position he held, (3) experienced an adverse employment action, and (4) that the adverse employment action occurred under circumstances that give rise to an inference of discrimination.[127]

In the Title VII context, "[e]mployment actions that the Second Circuit has characterized as 'sufficiently disadvantageous to constitute an adverse

---

[123]   *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 258 (S.D.N.Y. 2009) (quoting *Williams*, 872 N.Y.S.2d at 33).

[124]   *Id.* (quoting *Williams*, 872 N.Y.S.2d at 39).

[125]   *See McDonnell Douglas*, 411 U.S. at 802.  *See also Bernard v. J.P. Morgan Chase Bank*, No. 08 Civ. 4784, 2010 WL 423102, at *9,*15 n.6 (S.D.N.Y. Feb. 5, 2010), *aff'd*, 408 Fed. App'x 465 (2d Cir. 2011).

[126]   *See, e.g., Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

[127]   *See Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).

employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'"[128]  Material adversity requires "a change in working conditions . . . more disruptive than a mere inconvenience or an alteration of job responsibilities."[129] Although lateral transfers frequently are not considered materially adverse in the Second Circuit, "[a] lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way."[130]

A number of courts have now held that adverse employment actions need not be material in order to violate the NYCHRL and that any non-trivial discriminatory act is actionable.  There is no requirement of materiality in the text of either Title VII or the NYCHRL; it is a judicial interpretation of the statutes. "'[T]he City HRL now explicitly requires an independent liberal construction

---

[128]     *Parrilla v. City of New York*, No. 09 Civ. 8314, 2011 WL 611849, at *8 (S.D.N.Y. Feb. 16, 2011) (quoting *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)).

[129]     *Id.* at *9.

[130]     *Patrolmen's Benevolent Ass'n of N.Y. v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002).

analysis in all circumstances, even where State and federal civil rights laws have comparable language.'"[131] Accordingly, in *Williams v. The New York City Housing Authority*, the New York Appellate Division, First Department, held that "a focus on unequal treatment based on gender regardless of whether the conduct is 'tangible' (like hiring or firing) or not – is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the local statute."[132]  Because *Williams* concerned sexual harassment, and dealt with the impact of the Restoration Act on the traditional "severe or pervasive" standard in such cases, it did not address the question of how the Restoration Act affects the definition of an actionable adverse employment action.  Then, in September 2011, Judge Richard Holwell of this Court interpreted the Act and the First Department's holding to mean that an adverse action need not be material in order to violate the City law:

> the NYCHRL expands the definition of discrimination beyond "conduct [that] is 'tangible' (like hiring or firing)," a requirement embodied in the federal requirement that an action be "materially adverse" to be actionable, to encompass all allegations that a plaintiff is treated

---

[131]     *Loeffler*, 582 F.3d at 278 (quoting *Williams*, 872 N.Y.S.2d at 31).

[132]     *Williams*, 872 N.Y.S.2d at 39.  The Appellate Division made clear, however, that the new law does not create causes of action for "petty slights and trivial inconveniences" that are "truly insubstantial." *Id*.

differently based on protected status.[133]

Even more recently, Judge Nicholas Garaufis of the Eastern District of New York held that "under the [NYCHRL], the plaintiff need not show that she was subject to an 'adverse employment action'; instead, she need only show that 'she has been treated less well than other employees because of her gender.'"[134]

Thus, although the standard has not yet been clarified by either the New York Court of Appeals or the Second Circuit, it appears that, in order to make out the third prong of a prima facie case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty.  The fourth prong of the prima facie case is satisfied if a member of a protected class was treated differently than a worker who was not a member of that protected class.[135]

Once the plaintiff demonstrates a prima facie case, the burden shifts to

---

[133]     *Kerman-Mastour v. Financial Indus. Regulatory Auth.*, — F.Supp.2d — , 2011 WL 4526080, at *10 (S.D.N.Y. Sept. 30, 2011) (citing *Williams*, 872 N.Y.S.2d at 340).

[134]     *Zambrano-Lamhaouhi v. New York City Bd. of Educ.*, No. 08 Civ. 3140, 2011 WL 5856409, at *8 (E.D.N.Y. Nov. 21, 2011) (citing *Williams*, 872 N.Y.S.2d at 39).

[135]     *See Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (holding, in Title VII case, that "the mere fact that plaintiff was replaced by someone outside the protected class" raises the necessary inference of discrimination for the prima facie case).

the defendant to articulate a legitimate, nondiscriminatory reason for the differential treatment.[136]  The defendant must clearly set forth, through the introduction of admissible evidence, the reasons for its actions.[137]  If the explanation is legitimate and nondiscriminatory, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered explanation is merely a pretext for discrimination.[138]  Notably, in order to raise an issue of fact that is sufficiently material to defeat a motion for summary judgment, a plaintiff must produce not simply *some* evidence, but enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext to disguise discrimination.[139]  "The factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination."[140]  The factfinder may disbelieve the

---

[136]     *See Ruiz*, 609 F. 3d at 492.

[137]     *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

[138]     *See Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). *See also Beachum v. AWISCO New York*, 785 F. Supp. 2d 84, 93-94 (S.D.N.Y. 2011).

[139]     *See Weinstock*, 224 F.3d at 42.  *See also Mavrommatis v. Carey Limousine Westchester, Inc.*, No. 10 Civ. 3404, 2011 WL 3903429, at *2 (2d Cir. Sept. 7, 2011).

[140]     *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

defendant's explanation either because the facts underlying the explanation are false or because the explanation is weakened by inconsistencies or logical flaws.[141] Therefore, a plaintiff can survive summary judgment if he produces facts sufficient to permit a reasonable factfinder to disbelieve the defendant's explanation in favor of the plaintiff's explanation that discrimination occurred.  The plaintiff can sustain this burden by proving that "the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that [the adverse employment decision] was motivated at least in part by . . . discrimination."[142]

## B.    Retaliation

A prima facie case of retaliation under the NYCHRL consists of a showing by the plaintiff that: (1) he participated in a protected activity known to the defendant; (2) the employer engaged in some responsive conduct; and (3) there exists a connection between the two actions, such that "a jury could 'reasonably conclude from the evidence that [the complained-of] conduct [by the employer] was, in the words of the [NYCHRL], reasonably likely to deter a person from

---

[141]    *See Byrnie v. Town of Cromwell*, 243 F. 3d 93 (2d Cir. 2001) (summary judgment for defendant was improper where the defendant's stated reasons for its actions lacked credibility due to inconsistencies); Lex Larson, Employment Discrimination § 8.05[3].

[142]    *Tomassi v. Insignia Fin. Group*, 478 F.3d 111, 114 (2d Cir. 2007).

engaging in protected activity,' without taking account of whether the employer's conduct was sufficiently deterrent so as to be 'material[ ].'"[143]   In the summary judgment context, once "the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate, non-retaliatory reason for" its actions.[144]   If the defendant makes an adequate showing in this step, the plaintiff must demonstrate that the defendant's reasons are actually pretextual, which the plaintiff can do by showing that a "retaliatory motive played a part in the adverse employment actions even if it was not the sole cause."[145]

Whatever uncertainty may exist with regards to the materiality requirement for adverse employment actions in the discrimination context does not exist in the retaliation context: the text of the statute is clear that "retaliation . . . need not result in . . . a materially adverse change in the terms and conditions of employment" in order to be unlawful.[146]   The law bars "any manner" of

---

[143]     *Fincher*, 604 F.3d at 723 (quoting *Williams*, 872 N.Y.S.2d at 34).

[144]     *Kaytor*, 609 F.3d at 552-53.

[145]     *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  *Accord Ibok v. Securities Indus. Automation Corp.*, 369 Fed. App'x 210, 213 (2d Cir. 2010).

[146]     N.Y.C. Admin. Code § 8-107(7) (unlawful retaliation "need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment . . . provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to

retaliation.[147]  The jury must be able to find that the employer took *some* action

with respect to the employee after the employee's protected activity, but that action

need not be material, as required in a Title VII action, as long as it is reasonably

likely to deter a person from engaging in protected activity.[148]  NYCHRL

retaliation claims must "be weighed in a context-specific assessment of whether

conduct had a 'chilling effect' on protected activity — a judgment that 'a jury is

generally best suited to evaluate . . .'"[149]

## V.   DISCUSSION

### A.   Discrimination

The core of Williams' discrimination claim is that Hadfield treated

him differently than white employees.  Williams alleges that Hadfield ignored him

---

deter a person from engaging in protected activity").

[147]     *Williams*, 872 N.Y.S.2d at 34 (quoting N.Y.C. Admin Code. § 8-107(7)).  *Accord Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 48 (S.D.N.Y. 2009).

[148]     *See Fincher*, 604 F.3d at 723.  Title VII's prohibition on retaliation requires a *materially* adverse action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  Articulating the difference between a non-material adverse action that is reasonably likely to deter a person from complaining (NYCHRL) and a material adverse action that could well dissuade a reasonable person from complaining (Title VII) is a question left for another day.

[149]     *Winston*, 633 F. Supp. 2d at 48 (quoting *Williams*, 872 N.Y.S.2d at 34).

and excluded him from projects, decisions, and meetings that were critical to his job while including others in those decisions.  Williams also alleges that Regus prevented him from advancing to more senior positions for which he was qualified, and gave the jobs instead to less-experienced Caucasians, although he does not produce evidence showing that he ever applied for and was rejected for a promotion.[150]  Finally, Williams alleges that after he made his complaints, he was required to transfer to Dallas while other IT managers were permitted to remain in Florida and Atlanta.

There is no dispute over whether Williams satisfies the first two elements of his prima facie discrimination case: he is a member of a protected class and he was both qualified for his job and performed it satisfactorily.  However, Regus asserts that the admissible evidence does not permit a reasonable juror to conclude that Williams experienced an adverse employment action or, if there was an adverse employment action, that the action resulted from discrimination.[151]

### 1.    Adverse Employment Action

Williams alleges that Hadfield ignored his opinion on technical matters and did not communicate with him in the same way he did with Caucasian

---

[150]    *See* Compl.  ¶ 7.

[151]    *See* Def. Mem. at 9.

employees.[152]  As a general matter, Williams alleges that Hadfield "failed to show

up at scheduled meetings and conference calls,"[153] preventing Williams from

obtaining certain information critical to his work. [154]  In particular, Williams points

to Hadfield's failure to include him in any discussions about: (1) the termination of

one of Williams' subordinates; or (2) an important change in Regus' Help Desk

location.[155]  Williams notes that Liss, a white IT employee at a similar level of

management, *was* consulted on the Help Desk transition, even though working

with the Help Desk constituted a bigger part of Williams' job than Liss' job.  There

is also evidence showing that in late 2009, Hadfield proposed firing Williams and

giving his responsibilities to Trish Welker, a white woman who managed Telecoms

for the company.[156]  Although Hadfield testified that his plan had been to combine

telecoms and IT under somebody "that had IT and telecoms experience," and that

Williams was not qualified because he did not have telecoms experience, he also

---

[152]    *See* Williams Aff. ¶¶ 8-9.

[153]    Pl. Opp. Mem. at 8.

[154]    3/15/10 Email from Hadfield to Edmondson (4:04 PM), Ex. 3 to
Edmondson Decl.

[155]    *See* Williams Aff. ¶¶ 11, 22.

[156]    *See* 12/15/09 Email from Hadfield to Rotman, McCall, and
Edmondson (9:38 PM), Ex. 13 to Hadfield Decl. (explaining that "Trish Welker
will be responsible for the (new) combined IT & Telecoms helpdesk.").

testified that he did not know if Welker had any IT experience.[157]  Hadfield's plan was never executed.[158]

Regus disputes Williams' claim that he was being ignored by Hadfield.  Regus does not dispute Williams' assertion that he was excluded from the decisions to fire his subordinate and move the Help Desk; rather, Regus argues that there was no need to inform Williams in advance of either decision because the subordinate's termination was part of a very fast, high-level process of downsizing[159] and the Help Desk move did not impact Williams' job.[160]  Regus further argues that although Williams held a relatively senior position in the Company's hierarchy, he was not so senior, nor his job so central, that he needed to be privy to all meetings and communications that might be relevant to his work.[161]  Hadfield's records contain ample evidence that he was engaged in planning many medium- and long-term changes within the IT Department; some, but not all of

---

[157]    *See* Hadfield Dep. 56:4-57:24.

[158]    *See id.* 57:7.

[159]    *See id.* 121:5-25.

[160]    *See id.* 172:19-174:15.

[161]    *See* Hadfield Reply Decl. ¶ 4.

them, were expected to affect Williams.[162]  Regus points out that, on some

occasions, far from excluding Williams from decisions, Hadfield only learned of

the changes shortly before they happened[163] or received instructions from his own

superiors to carry out the changes swiftly and confidentially.[164]

Standing alone, Hadfield's alleged preferential treatment of Liss and

Welker would probably not rise to the level of a materially adverse employment

action necessary in order to make out a prima facie case in a Title VII case.

However, because such materiality does not appear to be necessary under the

NYCHRL, which prohibits all discrimination that is not merely trivial or petty, this

alleged treatment might well be sufficient to make out a prima facie case under the

local law.

There is, of course, another adverse employment action.  Williams

was required to relocate to Dallas and was fired when he refused to do so.  In his

opposition memorandum, Williams does not clearly argue that his termination was

the result of discrimination; rather, he argues only that it was the result of unlawful

---

[162]     *See* Hadfield Decl. ¶¶ 8-17; Americas Update (Hadfield), PowerPoint
Presentation (attachment to 12/13/08 Email from Hadfield to Barakat (8:52 AM)),
Ex. 10 to Hadfield Decl.

[163]     *See* Hadfield Reply Decl. ¶ 3.

[164]     *See* Hadfield Dep. 121:5-13.

retaliation.[165]  However, in his Complaint, Williams describes his August 30, 2010

termination and then incorporates this recitation into his cause of action for race

discrimination.[166]  Therefore, despite the lack of clarity in Williams' opposition

papers, I will assume that Williams has alleged that he was terminated as a result of

unlawful discrimination based on his race.

Regus' directive that Williams either relocate to Dallas or separate

from the Company is undoubtedly an adverse employment action.  In the Second

Circuit, under Title VII, lateral transfers sometimes do and sometimes do not

constitute adverse employment actions.[167]  The fundamental question, under Title

VII, is whether the transfer alters the terms and conditions of the plaintiff's

employment in a materially negative way.  Under the NYCHRL, however, the

question is likely whether the transfer represented unequal, non-trivial treatment.

Williams requested and received a transfer to New York in 2007 because his then-

---

[165]    *Compare* Pl. Mem. at 6-8 (discussing the adverse employment actions that Williams alleges constituted discrimination, but not mentioning Regus' demand that he transfer to Dallas or its decision to terminate him when he refused to do so) *with id.* at 14-16 (discussing the adverse employment actions that Williams alleges constituted retaliation, focusing primarily on the Dallas transfer and his termination).

[166]    *See* Compl. ¶¶ 28, 33-42.

[167]    *Compare Patrolmen's Benevolent Ass'n of N.Y.*, 310 F.3d 43 *with Galabya v. New York City Bd. of Educ.*, 202 F.3d 636 (2d Cir. 2000) (abrogated on other grounds).

fiancé could not find work in Dallas and had an established career in New York;

the transfer was authorized by Rotman.[168]  Requiring that an employee permanently

relocate from New York to Dallas, after he has specifically insisted on a transfer to

New York for important personal reasons, constitutes a change in the terms and

conditions of his employment sufficient to satisfy the NYCHRL.  Regus was well

aware of Williams' strong preference to live in New York with his wife, and

forcing him to move back to Dallas would clearly impact him in an adverse way.

### 2.    Inference of Discrimination

Williams has submitted sufficient evidence to satisfy the fourth prong

of the prima facie case.  It is undisputed that Williams is a member of a protected

class who was replaced by a Caucasian employee.[169]  Williams also points to

evidence that Hadfield advocated promoting Welker rather than him, despite no

clear evidence that she was more qualified.  And Williams claims that there were

no African-Americans in senior management at Regus.[170]  The fact that Williams'

replacement was not in a protected class alone provides the requisite inference of

---

[168]    *See* Pl. 56.1 ¶ 30; Rotman Dep. 46:2-20.

[169]    *See* Pl. 56.1 ¶ 90.

[170]    *See* Pl. Opp. Mem. at 9-10; Williams Aff. ¶10.

discrimination.[171]  Because Williams has satisfied the requirements for his prima

facie case, the burden shifts to Regus to provide non-discriminatory reasons for its

conduct.

### 3.    Regus' Business Justifications

Regus has asserted legitimate business justifications for its decision to

transfer Williams to Dallas.  Extensive restructuring of the IT team occurred

between 2007 and 2010 and the elimination or restructuring of Williams' position

had been discussed for a number of years.[172]  Hadfield explained in his deposition

that Regus "was moving all [Regional Service Center] department heads to Dallas.

[Williams] and his team are part of the RSC. . . . The need to have somebody like

Albert in Dallas increased" because Regus was building-up the RSC.[173]  Because

the IT Department was based in Dallas, Regus could reasonably determine that

Williams had to be there with his team.[174]

Regus' statements are legitimate, business-related explanations for

_____

[171]    *See Zimmermann*, 251 F.3d at 381.  *See also Pleener v. New York City Bd. of Educ.*, 311 Fed. App'x 479, 481 (2d Cir. 2009); *Beachum*, 785 F. Supp. 2d at 96.

[172]    *See* Def. Mem. at 6-7.

[173]    Hadfield Dep.112:24-113:8.  *See also* Hadfield Decl. ¶ 5.

[174]    *See* Hadfield Dep. 112:23-113:11 (detailing Regus' reasons for requiring Williams to be in Dallas).

requiring that Williams relocate to Dallas.  As a result, the burden shifts to

Williams to demonstrate that these explanations are merely a pretext for

discrimination against him.

### 4.    Evidence of Pretext

Williams has identified problems with each one of Regus'

justifications for his transfer.  *First*, although Regus now argues that Williams'

relocation was part of a general restructuring of the IT department,[175] neither Liss

(the Director of IT Projects) nor Hadfield (the head of the IT Department) were

told to move to Dallas from their permanent locations in Atlanta and Florida,

respectively.[176]  Rotman testified that Williams was required to relocate to Dallas

because the company needed to have its IT and telecom executives in Dallas,

without explaining why that need would not apply to Liss or Hadfield, the white IT

executives.[177]  Furthermore, "both Rotman and Hadfield specifically testified that

---

[175]      *See* Def. Mem. at 6.

[176]      *See* Rotman Dep. 172:9-173:3, 169:16-22.  Regus argues that Liss
was hired to work in Atlanta and there was no business need to have him in Dallas.
*See* Def. Reply 56.1 ¶ 76.  Although that evidence may well support the
Company's argument that the disparate treatment was not based on race, it does not
answer the charge definitively, particularly since Regus *did* seriously consider
requiring that Liss move to Dallas but decided not to do so.  *See* Rotman Dep. 172-
173.

[177]      *See* Rotman Dep. 169:5-23.

Williams' relocation . . . was *not* part of a restructuring," which contradicts Regus' argument.[178]   *Second*, although Edmondson and Hadfield initially told Williams that the transfer was necessary because of "communication problems,"[179] Regus offers no evidence that anyone at the Company raised concerns about communication issues before Williams lodged his complaints in May 2010.[180] Furthermore, Hadfield acknowledged that he never had a problem getting in touch with or meeting with Williams.[181]   *Third*, although Regus asserts that Williams was ordered to transfer because  "conditions no longer permit[ed] him to continue working in New York"[182] the Company provides no explanation for *why* this arrangement was no longer feasible.  Hadfield testified that there was no specific event that made it clear to him that Williams needed to be in Dallas other than "it was the right thing for [Williams] to be in Dallas with his team."[183]   It is undisputed

---

[178]     Pl. Opp. Mem. at 20 (citing Hadfield Dep. 100:20-23 and 101:10-13; Rotman Dep. 158:4-16).

[179]     *Id.* at 18; Edmondson Dep. 208:18-209:11.

[180]     If the problems Williams complained of were really due to "communication issues" between him and Hadfield, they would not be significantly fixed by a move to Dallas, because Hadfield worked in Regus' Florida office.  *See* Edmondson Dep. 209:24-210:2.

[181]     *See* Hadfield Dep. 114:12-17.

[182]     Def. Mem. at 17.

[183]     Hadfield Dep. 101:14-23.

that many members of Regus' management – including IT management – worked from locations around the country, supervising subordinates located elsewhere.[184] Regus has not explained why, with respect to Williams – and, apparently, Williams alone – this arrangement suddenly ceased to be satisfactory.  As Williams points out, he received generally good performance reviews and bonuses.[185]  Indeed, Rotman testified that "there was (sic) discussions many times about making [Williams] the head of the IT department" and said that Williams was "a clear candidate to be a head of IT."[186]  Although at various times there had been discussions about firing Williams or moving him to Dallas, Edmondson acknowledges that the decision to do so was never made with finality until after Williams complained of discrimination.[187]  *Finally*, although Regus presents evidence purporting to demonstrate that the major reason for its original plan to terminate Williams was to cut costs,[188] the Company offered him the opportunity to

---

[184]     *See supra* Part II.B.

[185]     *See* Pl. 56.1 ¶ 25; 2008 Performance Review – Corporate, Ex. 9 to Edmondson Decl.

[186]     Rotman Dep. 67:2-10.

[187]     *See* Edmondson Dep. 194:3-6.

[188]     *See, e.g.*, Def. Rep. Mem. at 6, 10; Americas Update (Hadfield); Def. 56.1 ¶ 17; PowerPoint Presentation (attachment to 12/13/08 Email from Hadfield to Barakat (8:52 AM)), Ex. 10 to Hadfield Decl (noting salary savings).

relocate to Dallas at the same salary he was then earning in New York.[189]

Williams has provided sufficient evidence to permit a reasonable juror to conclude that his transfer was motivated in part by discrimination.  Williams has identified serious problems with all of Regus' justifications for his transfer and has also produced evidence that would permit a factfinder to determine that discrimination was a reason for his treatment.[190]  *First*, Liss and Hadfield, the white IT managers, were treated differently than Williams and were permitted to continue working outside Dallas.  *Second*, Williams was replaced by a white employee and Regus did not interview any African Americans for the position. Williams need not prove that all of Regus' justifications are false, that those justifications were unrelated to his termination, or that discrimination was the only reason for his firing.  Nor need he show that in the absence of discrimination, he would not have been fired.  In order to establish liability, he must show only that discrimination played *a* role in his termination.[191]

---

[189]    *See* Edmondson Decl. ¶ 10.

[190]    *See Beachum*, 785 F. Supp. 2d at 98.  "'A reason cannot be proved to be a pretext for *discrimination* unless it is shown *both* that the reason was false *and* that discrimination was the real reason.'" *Id*. at 97 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).

[191]    *See* N.Y.C. Admin. Code § 8-101, making clear that the policy of the City is to "prevent discrimination from playing *any* role in actions relating to employment. . ." (emphasis added).  *See also Weiss v. JPMorgan Chase & Co.*,

The role of the court in deciding a motion for summary judgment 'is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[192]  In order to determine why Regus required Williams to relocate to Dallas, it will be necessary to weigh the conflicting evidence presented by the parties and evaluate the credibility of Hadfield, Williams, and the other Regus employees.  Those are tasks for a jury at trial, not the Court on summary judgment.

### B.    Retaliation

Williams' retaliation claim is based primarily on Regus' order that he move to Dallas, which came soon after he reported his concerns about racial discrimination, and his eventual termination when he refused to transfer.  Williams also argues that Hadfield's failure to inform Williams of the decision to move the Help Desk constituted retaliation.  Regus justifies its actions on the ground that they constituted ordinary business decisions unrelated to Williams' complaints and that the Company had planned to terminate Williams and replace him with

---

No. 06 Civ. 4402, 2010 WL 114248, at *1 (S.D.N.Y. Jan. 13, 2010), explaining that "the NYCHRL requires only that a plaintiff prove that age was 'a motivating factor' for an adverse employment action," not a 'but-for' cause of the discrimination.

[192]    *Wilson*, 625 F.3d at 60 (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986)).

someone in Dallas far in advance of his protected activities.

### 1.    Prima Facie Case

Williams' complaints about discrimination were clearly protected activities, and Regus certainly knew of them.[193]  Williams emailed Rotman and Edmondson on multiple occasions, complaining clearly and specifically about discrimination.[194]  It is also plain that Regus' order constituted an adverse employment action.[195]  Causation, the final element of the prima facie case, is established because Regus ordered Williams to relocate just thirteen days after his May 7 complaint.[196]  Such a close temporal connection provides a strong basis for inferring a causal connection between the protected activity and the adverse employment action.[197]  Therefore, Williams has established a prima facie case of

---

[193]    *See* 2/26/10 Email from Rotman to Williams (11:18 AM), Ex. E to Williams Aff.; 5/10/10 Email from Rotman to Edmondson (7:00 AM), Ex. J to Williams Aff.

[194]    *See id.*

[195]    *See supra* Part V.A.1.

[196]    Williams emailed Rotman about his concerns on May 7, 2010.  *See* Pl. 56.1 ¶ 62.  Hadfield and Edmondson told him of the Dallas transfer on May 20, 2010.  *See id.* at ¶ 66.

[197]    *See Treglia v. Town of Manlius*, 313 F.3d 713, 720-21 (2d Cir. 2002) (holding that where plaintiff engaged in multiple protected activities, and an adverse action occurred one month after the most recent protected activity, the temporal connection was close enough to give rise to an inference of causation). *See also Kaytor*, 609 F.3d at 552 (holding, in Title VII context, that "[c]lose

retaliation, and the burden shifts to Regus to provide a legitimate reason for the adverse employment action.

### 2. Regus' Business Reasons for Its Conduct

As explained above, Regus has provided legitimate business justifications for ordering Williams to transfer to Dallas.[198]  The burden thus shifts to Williams to demonstrate that this showing is merely a pretext for impermissible retaliation.

### 3. Evidence of Pretext

In arguing that Regus' business justifications are pretextual, Williams relies primarily on the temporal connection between his complaints and the transfer order[199] and the inconsistencies and contradictions in Regus' business justifications that are discussed above.[200]   In addition, Williams testified that after his complaints, Hadfield started to belittle him and scream at him during telephone conversations and Rotman yelled at him about his allegations without ever asking

---

temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action.").

[198]    *See supra* Part V.A.3.

[199]    *See* Pl. Opp. Mem. at 20.

[200]    *See supra* Part V.A.4.

why Williams believed he was the victim of discrimination.[201]  As evidence that

Rotman gave short shrift to Williams' complaints, Williams points to Rotman's

testimony that he does not believe that complaints of discrimination at Regus can

be true, because he does not permit discrimination.[202]  Rotman and Hadfield

dispute Williams' characterization of their conversations.  But a reasonable juror

could find that Hadfield and Rotman's reactions lend support to Williams'

retaliation claim.

Standing alone, even a close temporal connection between a

complaint of discrimination and an adverse employment action is insufficient to

establish evidence of pretext under Title VII.[203]  (It is unclear whether sufficiently

close temporal proximity, standing alone, would be sufficient under the

NYCHRL).  However, the inconsistencies in the various explanations offered by

Regus for transferring Williams to Dallas and the evidence that Rotman and

---

[201]     *See supra* Part II.D.

[202]     *See* Rotman Dep. 83:13-19 (A: I don't allow any kind of
discrimination at all in the company. Q: So if anybody were to present a complaint
of discrimination, it would be nonsense because you don't allow discrimination?
A: Correct.").

[203]     *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931 (2d Cir. 2010).  *See
also Tsaganea v. City Univ. of New York, Baruch Coll.*, 10 Civ. 2322, 2011 WL
4036101 (2d Cir. Sept. 13, 2011); *Aka v. Jacob K. Javits Convention Ctr. of New
York*, No. 09 Civ. 8195, 2011 WL 4549610 (S.D.N.Y. Sept. 30, 2011).

Hadfield responded to Williams' allegations by yelling at him, combined with the temporal proximity between his complaints and the transfer order, create a material dispute as to whether Regus' actions were merely a pretext for impermissible retaliation against Williams for his protected activities. Under the liberal provisions of the NYCHRL, this dispute is sufficient to withstand summary judgment.[204]

The parties have presented dramatically different versions of these events. According to Regus, Williams realized that he might be laid off and complained of racial discrimination in order to protect himself. He was later ordered to relocate to Dallas as part of a long-planned restructuring and fired when he refused to do so. According to Williams, after raising legitimate concerns about the unlawful discrimination that he had witnessed and suffered, his managers made him an offer that they knew he would not accept, and he was forced out of his position. These conflicting versions require resolution by a jury.

## VI.  CONCLUSION

For the foregoing reasons, defendant's motion is denied and the Clerk of the Court is directed to close this motion [Docket No. 29]. The final pre-trial conference scheduled for December 7, 2011, at 4:30 p.m. is adjourned to

---

[204]    *See Ibok*, 369 Fed. App'x at 214.

December 20, 2011 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 6, 2011

**-Appearances-**

**For Plaintiff:**

Brian Heller, Esq.
Schwartz & Perry
295 Madison Avenue
New York, NY 10017
(212) 889-6565

**For Defendant:**

Dave Carothers, Esq.
Carlton, DiSante & Freudenberger LLP
4510 Executive Drive, Suite 300
San Diego, CA 92121
(858) 646-0007

Michael V. Cibella, Esq.
Law Offices of Michael V. Cibella, LLC
546 Fifth Avenue
New York, NY 10036
(212) 818-1880